IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

ROBERT TITUS,

                    Plaintiff,                               CV-08-1330-SU

      v.                                         OPINION AND ORDER

CITY OF PRAIRIE CITY, a municipal
corporation, STAN HORRELL, an individual, JIM
MUNYON, an individual, FRANK PRIMOZIC, an
individual, PAM WOODWORTH, an individual,
TIM COE, an individual, ROGER MCKINLEY, an
individual, BILL HARRINGTON, an individual,
DIANE CLINGMAN, an individual, and ANNA
BASS, an individual,

                    Defendants.

_____

SULLIVAN, Magistrate Judge:

      This action arises out of the termination of plaintiff, Robert Titus, from his employment

as Public Works Director for the City of Prairie City, Oregon ("City").  He brings claims against

the City and names as individual defendants City Council Members Mayor Stan Horrell, Jim

1 - OPINION AND ORDER

Munyon, Frank Primozic, Pam Woodworth, Tim Coe, Roger McKinley, and Bill Harrington (collectively, "City Council"), Diane Clingman, the City Recorder ("City Recorder Clingman"), and Anna Bass, former City Council member and current City Recorder for the City of John Day.

Titus brings several claims under 42 U.S.C. § 1983 for violation of his constitutional right to privacy, age discrimination, use of protected medical leave, procedural due process, and substantive due process. Titus also claims a violation of the Family Medical Leave Act, 29 U.S.C. §§ 2601-2654 ("FMLA"). He brings state law claims for wrongful discharge, invasion of privacy, intentional infliction of emotional distress ("IIED"), violations of the Oregon Family and Medical Leave Act ("OFLA"), O.R.S. 659A.150-186, and age discrimination under Oregon law. The court has original subject matter jurisdiction over Titus' § 1983 claims, 28 U.S.C. § 1331, and supplemental jurisdiction over his state law claims, 28 U.S.C. § 1367. All parties have filed written consents to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c).

Presently before the court is defendants' motion for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

## LEGAL STANDARD

Fed. R. Civ. P. 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to a judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

2 - OPINION AND ORDER

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id.* at 631. (citation omitted).

## BACKGROUND

Titus worked as an employee of the City for approximately 23 years. Titus Dep. at 13:8-12.[1] He began in 1985 in general maintenance, and was ultimately promoted to Public Works Director. *Id.* He continued in this position until his termination on April 2, 2008.

The City is a municipal corporation located in Grant County, Oregon, which has an approximate population of 1,100. Aff. of Stan Horrell in Supp. of Mot. for Summ. J. ("Horrell Aff.") at 2. Horrell has been the City's mayor since January 1, 2007, and served as Titus' immediate supervisor at the time of his dismissal. *Id.*, Ex. 120. He also served as a voting member of the City Council, along with six other members of the City Council (Harrington, Coe, McKinley, Primozic, Woodworth, Munyon) who have also been named as defendants in the present case.

Clingman is the City Recorder, and served in this position at all relevant times. Aff. of Diane Clingman in Supp. of Mot. for Summ. J. ("Clingman Aff.") at 2. She is not a member of the City Council and therefore has no voting power. However, she regularly attends City Council meetings because her job responsibilities include preparing information for the City

---

[1] Deposition Transcript Excerpts to Plaintiff's Response to Concise Statement of Material Facts. (Docket # 62). Both parties have submitted documents with various attachments. Unless otherwise indicated, all deposition citations are directly to the authenticating depositions, not the documents to which they are attached.

Council and documenting the minutes for those meetings. *Id.* Bass is the City Recorder for the City of John Day, Oregon, and served in this position at all relevant times. Aff. of Anna Bass in Supp. of Mot. for Summ. J.("Bass Aff.") at 2. She was also a member of Prairie City's City Council from January 2002 to December 2004. *Id.*

On March 6, 2008, Titus told Horrell that he was going to the doctor.[2] Horrell Aff. at 2. Titus returned later that day with a doctor's note, which stated, "Please give Bob off until April 15th for medical reasons." Horrell Aff. Ex. 101. Titus was granted sick leave until April 15, 2008. Horrell Aff. at 2.

Several days after Titus requested sick leave, a City employee told Horrell that a John Day police officer had seen Titus working on a sidewalk construction project in John Day. *Id.* Horrell also received two to three phone calls during March 2008 from citizens reporting that they had also seen Titus working in John Day. *Id.* On March 17, 2008, Horrell received an anonymous handwritten letter from a citizen commenting that Titus "ha[d] worked very little since Nov[.]" Horrell Aff. at 3, Ex. 102. The letter also stated that the citizen had heard Titus was on medical leave, and was "now working for Dice Const. on John Days [*sic*] sidewalk[.]" *Id.* The citizen requested that Horrell "[f]ire Mr. Titus and get someone to work for the people of [the City] who care [*sic*]. . . . [and to] look into [the matter]." *Id.*

The City's Personnel Policy ("Personnel Policy"), adopted by the City Council on March 9, 2000, prohibits regular employees from "accept[ing] outside employment whether part-time, temporary, or permanent, without prior written approval from the City Council." Horrell Aff.

---

[2]    The parties dispute whether Titus told Horrell he was going to the doctor because of his back or whether he did not specify the reason for the visit..

Ex. 112 at 21.  The Personnel Policy also prohibits the abuse of sick leave privileges, stating

"[a]buse of sick leave privileges shall be cause for dismissal."  *Id.* at 48.

After receiving the complaints, Horrell wrote a letter to Titus dated March 20, 2008.  It

stated, in relevant part:

> Because you have apparently been working in a position substantially
> similar to your City job while you are off on "medical" leave, the City is
> considering disciplinary action.  The City has not decided what, if any,
> discipline may be appropriate, but all levels of discipline are being
> considered up to and including termination.
>
> Please be advised that your behavior violates the City's personnel rules,
> specifically:
>
> SECTION 2.11 OUTSIDE EMPLOYMENT
> 2.1 1.1 No regular employee shall accept outside employment whether
> part-time, temporary, or permanent, without prior written approval from
> the City Council.
>
> SECTION 6.3 SICK LEAVE
> 6.3.6 Abuse of the sick leave privilege shall be cause for dismissal.
>
> You have the opportunity to address the City Council and respond to this
> letter at Executive Session on Wednesday, March 26, 2008 at the end of
> the regular 6:30 p.m. City Council meeting.  The purpose of the Executive
> Session is to allow you to explain or contest our findings or provide
> mitigating facts.  Your statements will be reviewed carefully before any
> decision is finalized.
>
> If you prefer, you can submit a written explanation to the City, however, it
> must be received by me by 5:00 p.m. Tuesday, March 25, 2008.  If you do
> not respond, I will conclude that you intend for the City Council to decide
> the matter based upon the information they now have.

Horrell Aff. Ex. 103, at 1-2.

In response to the letter, Titus called Horrell on March 21, 2008, and March 22, 2008.

Horrell Aff. at 3-4.  Horrell took handwritten notes of the conversations.  *Id.* Ex. 104.  The notes

provide, in pertinent part: "[Titus'] doctor told him it would be good therapy for him to work and

5 - OPINION AND ORDER

get over his problem . . . [and] he would have his doctor write [the City Council] a letter when

[his doctor got] back after the 31st." *Id.*

Pursuant to the terms of the March 20, 2008, letter, Titus sent a written explanation to the

City Council dated March 23, 2008, which stated:

> To Whom It May Concern:  It is my understanding that the social and
> economic well being of the City is dependent upon Healthy and
> Productive Employees.  The responsibility of the Employer is to provide a
> safe and healthy workplace.
>
> Health endangering in the workplace includes: bullying, abuse &
> harassment that seriously affect targeted employees.
>
> Some of the affects of such bullying include but are not limited to:
> feelings of shame & humiliation, stress, loss of sleep, severe anxiety,
> depression, post traumatic stress disorder, reduces immunity to infection,
> stress related gastrointestinal disorders, hypertension and path [*sic*]
> physiological changes that increase the risk of cardiovascular diseases.
>
> It was also my understanding if an Employer had questions about the
> honor & integrity of an Employee regarding their work ethics, their
> Employer would in fact conduct an investigation, which might include
> visiting with the employee, before coming to any conclusion regarding a
> disciplinary action, especially if the information they were basing their
> decision on was based solely on gratuitous sabotage.
>
> In that light, let it be known that I, Bob Titus, deny any and all charges as
> outlined in the certified letter that I received on March 21, 2008.

Horrell Aff. Ex. 105.

Carrol Titus, Titus' wife, also sent a letter, dated March 25, 2008.  Horrell Aff. Ex. 106.

It alleged, among other things, that the City Council was harassing Titus, and stated her

dissatisfaction that no one from the City had contacted Titus to discuss to the matter.  Mrs. Titus

also offered to obtain a letter from Titus' doctor after the doctor returned from vacation.  *Id.*

On March 26, 2008, the City Council held an executive session to discuss the issue. Horrell Aff. at 4. Titus did not attend the session, but did submit a written explanation to the City pursuant to the March 20, 2008, letter. *Id.*; Titus Dep. at 28. The minutes of this executive session indicate that the City Council members reviewed a summary of events and read aloud all documents and correspondence received up until that point.[3] Pl.'s Supp. Response, Ex. A at 2. Harrington stated that there was a clear violation of the sick leave policy because Titus was doing substantially the same work that he was doing for the City while he was out on paid sick leave. *Id.* He noted that they did not have enough information about whether Titus violated the outside employment policy because they did not know whether Titus had been paid for his work. *Id.* The next note in the minutes states that:

> [McKinley] said that the information he was about to share must not be disclosed outside this room and then he presented information about [Titus] being diagnosed with bipolar disease, having been treated for many years and that there are serious side effects of to [*sic*] use of alcohol for people with this diagnosis. [Harrington] informed [McKinley] that he felt it was inappropriate to present this personal information to the Council. [Harrington] asked [McKinley] if [Titus] had told him this information and he responded yes. [Harrington] asked him if [Titus] had given him permission to give this information to the Council and he responded no. [Harrington] repeated that it was inappropriate for [McKinley] to share personal medical information without the consent of the individual. [McKinley] said he would provide the Council with any information he wanted to.

*Id.*

The City Council agreed that there was at least a clear violation of the sick leave policy, but noted that they needed to determine what action was appropriate. *Id.* at 3. The consensus

---

[3] Minutes were prepared for this executive session because the tape recorder malfunctioned during the meeting.

among the members was that it was not necessary to provide Titus with another opportunity to

respond in person or in writing. *Id.* Harrington noted that he thought that the violation was

serious enough that he was willing to make the motion to terminate Titus. *Id.* After polling

everyone present, at least five members agreed that disciplinary action was appropriate, but

Horrell noted that he needed to explore whether he had a conflict of interest before offering his

opinion. *Id.* The City Council concluded by agreeing to hold a second executive session on

April 2, 2008. *Id.*

     Horrell sent a letter to Titus dated March 27, 2008, notifying him of the second executive

session. Horrell Aff. at 4, Ex. 108. The letter provided, in pertinent part:

> You have previously been notified of the City's investigation into your
> apparent violation of its personnel policy as outlined below. The City has
> not decided what, if any, discipline may be appropriate, but all levels of
> discipline are being considered up to and including termination.
>
>                           \*\*\*
>
> By your own decision you did not attend the executive session held March
> 26, 2008. The City Council will meet at 7:00 p.m. on Wednesday April 2,
> 2008 to render a decision. An executive session will be held pursuant to
> ORS 192.660(2)(b) to consider any new information. You will have the
> opportunity to address the City Council and explain or contest our
> findings or provide mitigating facts; or if you prefer you can submit a
> written explanation to me by 5:30 p.m. Wednesday, April 2, 2008. If you
> do not respond, the City Council will conclude that you intend for them to
> decide the matter based upon the information at hand. The review will be
> completed and a decision will be made and communicated to you no later
> than 5:00 p.m. Thursday, April 3, 2008.

*Id.* Ex. 108.

     On April 2, 2008, the City Council convened again to discuss the issues. Horrell Aff. at

5. The meeting was open to the public at Titus' request. Clingman Aff. Ex. 109 at 3. The

minutes of the April 2, 2008, meeting provide, in pertinent part:

8 - OPINION AND ORDER

**Jim Munyon:** Bob, where [*sic*] you employed?

**Bob:** Read the letter [dated March 23, 2008]

**Jim Munyon:** doesn't say a whole lot

**Bob**: Read the bottom . . .

***

**Jim Munyon**: are you saying you weren't employed?

**Bob:** there's your answer kay. . . .

***

**Frank Promozic:** I'd like to try one question to Bob. Can you explain to me the difference in what you were doing down in John Day as apposed [*sic*] to your job here?  And just to make sure I understand this, you were taking sick leave from your job here and doing a similar function down in John Day?

**Bob:** That's between me and my doctor. . . .

***

**Rodger[*sic*] McKinley:** I think it's been verified that he's been working based on the letters. -A phone call- whether he was paid for his employment?  I don't know. Or if it could all be volunteer.  Can we get verification of that?  The easiest way is to get Bob to respond, that would be the easiest way, or Mr. Dice is he here?

**Tim Coe:** if [*sic*] he is off on the other the 6.3 the sick leave then he is off on sick for the City of Prairie and he has been down in John Day working or volunteering, then I don't know and he won't respond.

**Bob:** I didn't come down here to do your job for you that's part of your investigation.

**Jim Munyon:** Part of the investigation Bob is also to be able to talk to you and based off your letter your telling us to make a decision.  He won't talk.

***

**Bill Harrington:** based on the letter the Mayor got he was in violation, it's pretty obvious due to the information that was provided that he was in violation of the sick leave policy.  He could not perform his duty here due to sickness, but he was doing the same work for Dice, so the violation could be acted on.

**Bill Harrington:** we [*sic*] don't have enough information, the interpretation of the employee compensation on the first item, it would be difficult with the information we have whether he was employed, with the definition of him being compensated.  But on the second one it doesn't substantiate him doing the same type of work he might be doing here and the reason he wasn't able to perform his work here was because of illness and that was clear violation of his sick leave.

Clingman Aff. Ex. 115, at 5-7.

9 - OPINION AND ORDER

At the April 2, 2008, hearing, the City Council unanimously decided to terminate Titus' employment.  Horrell Aff. Ex. 110.  Horrell sent Titus a letter dated April 3, 2008, confirming the City Council's decision and notifying him of his right to appeal the decision as set forth in the Personnel Policy.  *Id.*

Titus notified Horrell in a letter dated April 10, 2008, of his intention to appeal the City Council's decision. Horrell Aff. Ex. 111.  As required under the Personnel Policy, Horrell then appointed a three-member Personnel Review Board "comprised of one Councilor, one person at large and one peer of the employee[.]"   Horrell Aff. Ex. 112, at 31.  The individuals selected were Harrington as the City Council member, Bass as the person at large, and Les Percy ("Percy") as Titus' peer.  Horrell Aff. at 6.  At the time, Percy was the Public Works Director of Canyon City, Oregon.  *Id.*

In a letter dated April 29, 2008, Horrell notified Titus that his appeal hearing would be held on May 8, 2008, at 5:30 p.m.  Horrell Aff. Ex. 113.  Before the hearing, on May 8, 2008, Titus' attorney, Roxanne L. Farra, sent a letter via fax and regular mail to Horrell, requesting that it be distributed.  Clingman Aff. Ex. 115, at 2.  The letter contained, among other things, Ms. Farra's concern that the Personnel Review Board be comprised of people who did not vote on Titus' termination and who were not biased.  *Id.* at 2-4.  The letter also contained Ms. Farra's objections to Titus' dismissal.  *Id.*  The letter was distributed to each member of the Personnel Review Board.  Clingman Aff. at 4.

The Personnel Review Board convened in executive session on May 8, 2008.  Bass Aff. at 2.  Titus attended the hearing, and Ms. Farra attended the meeting by telephone.  *Id.*  After reviewing the submitted materials, the Personnel Review Board voted unanimously to terminate

Titus' employment.  Clingman Aff. Ex. 116, at 2.  Titus filed the instant action as a result of his

termination from his position as Public Works Director.

## DISCUSSION

Titus' complaint alleges nine Claims for Relief.  The First, Second, and Third Claims

allege violations of § 1983 based on the following:  (1) right to privacy, (2) age discrimination,

(3) use of protected medical leave, (4) procedural due process, and (5) substantive due process.

Titus has abandoned his claims to age discrimination and use of protected medical leave, leaving

only the privacy and procedural and substantive due process claims as his § 1983 claims.  Titus

has also abandoned his FMLA claim (Fourth Claim).  Titus also alleges state law claims against

the City for violations of OFLA (Fifth Claim), age discrimination claim arising under ORS

659A.030 (Sixth Claim), wrongful discharge (Seventh Claim), invasion of privacy (Eighth

Claim), and IIED (Ninth Claim).  Titus has abandoned his state law age discrimination claim.

Defendants' motion for summary judgment regarding claims abandoned by plaintiff is granted.

## I.  § 1983 Claims (First, Second, Third Claims)

Titus alleges three § 1983 claims.  The First Claim is against the City for violation of

privacy and procedural and substantive due process.  The Second Claim is against the individual

City Council members and City Recorder Clingman for violation of privacy and procedural and

substantive due process.  The Third Claim is against Bass, Harrington, and City Recorder

Clingman, and pertains to their involvement with the Personnel Review Board proceedings.[4]  The

Third Claim does not include allegations relating to Titus' privacy rights, alleging only that his

_____

[4]  Titus has abandoned his Third Claim against Woodworth.  Pl's Opp'n at 11.

11 - OPINION AND ORDER

procedural and substantive due process rights were violated.  Defendants move for summary

judgment against these claims, asserting that they committed no constitutional violations.

42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . .

In general, to establish that a defendant is liable for a claim under § 1983, a plaintiff must

show "(1) that the conduct complained of was committed by a person acting under color of state

law; and (2) that the conduct deprived the plaintiff of a constitutional right." *Balistreri v. Pacifica*

*Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  Liability under § 1983 requires proof that a

defendant's deliberate or affirmative act or omission caused the unconstitutional deprivation.

*Stevenson v. Koskey*, 877 F.2d 1435, 1439 (9th Cir. 1989).

Municipalities and other local governmental entities, including cities, are "persons" within

the meaning of § 1983.  *Monell v. Dep't of Soc. Svcs. of N.Y.*, 436 U.S.658, 690-91. (1978).

Municipalities can be held liable for violations of § 1983 as a result of the actions of its officials,

despite the alleged good faith of those officials.  *Owen v. City of Independence*, 445 U.S. 622

(1980).

Here, Titus brings suit against the City and the individual current or former City officials

involved in his termination.  He brings his claims against the City under the theory that the City

acted through its officials to deprive him of his constitutional rights.  Compl. at ¶ 7.  He also

alleges separate § 1983 claims against the individual City Council members who, in the course of

their official duties and acting under color of state law, took action in their individual capacities to deprive Titus of his rights.  *Id.* at ¶¶ 38, 42.   Titus also alleges  violations of his constitutional rights under § 1983 by City Recorder Clingman and Bass as individuals.  Defendants contend that none of the defendants ever took any action that violated any of Titus' constitutional rights, and thus the City cannot be liable by way of the actions of its officials, nor can the individual defendants be held personally liable.

### A. § 1983 Claims against the City

#### 1. Right to Privacy

Titus alleges that his right to privacy was violated by the City as a result of the City Council's inquiry into his personal medical information.  The Ninth Circuit recognizes two types of constitutionally-protected privacy interests.  The first is the individual interest in avoiding disclosure of personal matters, known as "informational privacy," and the second is the interest in independence in making certain kinds of important decisions, such as marriage, procreation, and family relationships.  *In re Crawford,* 194 F.3d 954, 958 (9th Cir.1999), *cert. denied,* 528 U.S. 1189 (2000).  The right to informational privacy encompasses the disclosure of medical information.  *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004) (citation omitted).  However, "the privacy protection afforded medical information is not absolute; rather, it is a conditional right which may be infringed upon a showing of proper governmental interest." *Roe v. Sherry*, 91 F.3d 1270, 1274 (9th Cir. 1996 ) (citation omitted).  "The government may obtain and use medical information if its interest in obtaining the information outweighs a person's interest in privacy."  *Id.*  The more sensitive the information, the stronger the state's

interest must be. *See Thorne v. City of El Segundo*, 726 F.2d 459, 469 (9th Cir. 1983), *cert. denied,* 469 U.S. 979 (1984).

> The court must weigh the competing interests, considering the following factors:
>
>> the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*In re Crawford*, 194 F.3d at 959 (citation omitted).  In most cases, it is the overall context, rather than the particular item of information, that will dictate the tipping of the scales.  *Id.*

The question is whether the City violated Titus' constitutional right to privacy.  Titus contends that the City violated this right by asking him to appear before the City Council to discuss his private medical issues.  He argues that this was contrary to the Personnel Policy, which requires "[t]he supervisor of an employee, or in the case of a Supervisor the Mayor and/or City Council, [to] discuss improper or inadequate performance with the employee to correct the deficiencies and to avoid the need to exercise disciplinary action."  Horrell Aff. Ex. 112, at 28. Titus asserts that Horrell could have easily discussed the issue with him in private or obtained his consent to speak with his physician.  The City contends that it never demanded or obtained sensitive medical information from Titus during the hearings, and did not question Titus about his medical health or reason for sick leave.  The City asserts that the only medical information shared with it was given voluntarily by Titus, when he told Horrell that he was seeing his doctor, and subsequently presented Horrell with a doctor's note requesting time off "for medical reasons." *See* Horrell Aff., Ex. 101.  Lastly, it contends that the information is not highly sensitive and that

even if defendants did inquire regarding Titus' reasons for taking sick leave, employers are entitled to ask for such information before approving sick leave.

As originally filed, the record submitted by defendants supports the City's position that it never requested any personal medical information from Titus, and he never disclosed any other than his doctor's note, which did not provide any specific information regarding the nature and degree of his need for sick leave. On the surface, this would seem to lead to the reasonable conclusion that the City did not investigate, for better or for worse, Titus' need for sick leave, and therefore could not possibly have violated his privacy.

However, the record does not end there. The meeting minutes produced after oral argument reveal that during the March 26, 2008, executive session, there was an actual disclosure of Titus' personal medical information without his knowledge or consent. Pl.'s Supp. Response, Ex. A at 2. The minutes indicate that defendant McKinley stated that "the information he was about to share must not be disclosed outside this room" and then revealed that Titus suffers from bipolar disorder, for which he has been treated for many years. *Id.* McKinley also mentioned that there are serious side effects of alcohol use in connection with this disorder. *Id.* Not only did he reveal Titus' confidential medical information to the other six City Council members present, he did so outside of Titus' presence and without Titus' knowledge or consent. The minutes do not indicate how long the members discussed this disclosure or to what degree it factored into their ultimate decision to discipline Titus for his violation of the sick leave policy, since the tape recorder malfunctioned and all that exists to memorialize the substance of this nearly 90-minute meeting is a two page document. *See* Clingman Aff. Ex. 107 at 3 (noting on the public meeting minutes that the executive session began at 7:35 p.m. and ended at 8:52 p.m.). The executive

15 - OPINION AND ORDER

session minutes indicate that shortly after McKinley's disclosure, Harrington stated that he thought there was enough information to terminate Titus for violating the sick leave policy, and that the City Council need not provide Titus an additional opportunity to provide a written or oral statement.  Pl.'s Supp. Response Ex. A at 3.  Each of the City Council members were polled, and at least five voted to terminate Titus' employment.[5]  *Id.*  The meeting ended with Horrell indicating that he might have a conflict of interest that would prevent him from casting his vote.  *Id.*  However, for all intents and purposes, the minutes make clear that the City Council had made up its mind at the March 26, 2008, executive session.

There is no further documentation that the City Council members discussed Titus' bipolar disease and alleged alcohol use at any other time, as there is no mention of this confidential information in any of the other meeting minutes or hearing transcripts, including the subsequent session on April 2, 2008, where the City Council formally voted to terminate Titus' employment.  Nor was it brought up during the May 6, 2008, Personnel Review Board's proceedings, despite the presence of Harrington, who was present at all three meetings, and who had told McKinley that it was improper for him to have revealed Titus' confidential medical information to the City Council without Titus' consent.  None of the City Council members ever disclosed in their affidavits and depositions submitted with defendants' motion for summary judgment that they had

---

[5]  The executive session minutes imply that defendant McKinley was "undecided" regarding whether Titus should be terminated.  Pl.'s Supp. Response Ex. A  at 3.  However, McKinley's supplemental deposition, taken after the production of the executive session minutes and termination hearing transcripts, indicates that he was not at all undecided regarding the action he wanted to take, and that as of March 26, 2008, he was sure that termination was appropriate.  McKinley Dep. at 89-90.

any information related to Titus' medical condition, and their affidavits only discuss the April 2,

2008, meeting, omitting mention of the March 26, 2008, meeting entirely.

McKinley stated in his affidavit that at the April 2, 2008, meeting he "never asked the

plaintiff for medical information, nor did the plaintiff disclose any medical information."

McKinley Aff. at 2.  In his original deposition, McKinley gave similarly vague information about

what medical information he was aware of at the time he voted to terminate Titus' employment.

> Q.  At the time that you voted to fire Mr. Titus, did you know what
> restrictions his doctor had placed on him in terms of his medical leave?
> A.  I don't recall.
> Q.  Do you know what was the cause of his need for a medical leave?
> A.  By whose determination?
> Q.  Anyone's.  What were you told? What was your understanding of what
> the need was?
> A.  The letter that Mr. Titus' wife wrote was that he needed just to get
> away.
> Q:  Anything else?
> A.  I don't recall.

McKinley Dep. at 26-27.

Defendant Woodworth was similarly vague.

> Q.  What was your understanding of the medical restrictions on Mr. Titus
> relating to his medical leave?
> A.  I -- I didn't have any.  He wouldn't say.  Bob would not say.

Woodworth Dep. at 22.

Defendants filed a motion to strike a document containing Titus' doctor's treatment notes

which included a discussion of bipolar disorder and work-related stress, on the grounds that the

information is irrelevant because it was not provided to defendants prior to Titus' termination.

Defs. Mot. to Strike Ex. B to Aff. (docket # 67).

It was not until after oral argument that defendants produced the minutes from the March 26, 2008, meeting, and only after this court expressly ordered that they produce the tapes of all three meetings related to Titus' termination. In depositions taken after the minutes from the March 26, 2008, meeting were produced, defendants still testified that they did not recall any other detail regarding McKinley's revelation of Titus' bipolar disorder other than the few sentences in the minutes. *See* Supp. Response, Ex. B (Harrington Dep.) at 84-85; Ex. C (Horrell Dep.) at 86; Ex. E (Coe Dep.) at 75-76; Ex. G (Woodworth Dep.) at 78, 95-96; Ex. H (Munyon Dep.) at 47.

It is undisputed that the City Council members failed to mention in any of their depositions or affidavits that they were aware that Titus suffered from bipolar disorder. Whether they honestly did not consider Titus' confidential medical information relevant to their ultimate conclusion is a factual matter. In other words, the City Council may have concluded that Titus violated the sick leave policy by performing physical work in a nearby city when he was out on paid sick leave, regardless of the underlying reason for the leave.[6] On the other hand, the City Council may well have made up its mind based on this unauthorized confidential disclosure and then intentionally never mentioned the information again in order to conceal the fact that the information was disclosed in an inappropriate manner.

In order to decide whether the disclosure was so egregious as to constitute a constitutional transgression, a further evaluation of the City Council members' justifications for their behavior

---

[6] Whether defendants could have further investigated the reasons for Titus' sick leave by asking him about it or getting his consent to talk to his physician, is not relevant to the court's determination of whether his privacy rights were violated. Such an inquiry is more appropriate when considering whether Titus' procedural due process rights were violated.

after the March 26, 2008, disclosure of Titus' sensitive medical information is required.  This requires a full airing of the evidence and an opportunity to make credibility determinations.  Such an inquiry is an ultimate issue of fact for the jury to decide, thereby making summary judgment on Titus' privacy claim against the City inappropriate.  Defendants motion for summary judgment on the First Claim is denied to the extent that it rests on the City's alleged violation of Titus' privacy rights.

### 2.  Procedural Due Process

Titus alleges that his procedural due process rights were violated by the City.  Titus contends that the termination proceedings were essentially sham proceedings because defendants had already made up their minds, thereby denying him his constitutional right to procedural due process.  Titus claims that the City Council came to a "predetermined outcome" and that he did not have a hearing before an impartial tribunal.  Compl. ¶ 38.  Defendants assert that Titus had no property interest in continued employment, and that even if he did, he was afforded adequate due process because he was provided notice and an opportunity to be heard.

The Fourteenth Amendment provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  A § 1983 claim based upon the deprivation of procedural due process has three elements:  "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process."  *Portman v. Cnty of Santa Clara,* 995 F.2d 898, 904 (9th Cir. 1993).  "The essential requirements of [a] pre-termination process are notice and an opportunity to respond."  *Clements v. Airport Authority if Washoe County,* 69 F.3d 321, 332 (9th Cir.1995).  A

threshold requirement of procedural due process is a constitutionally protected property interest. *Wedges/Ledges of Cal., Inc. v. City of Phoenix,* 24 F.3d 56, 62 (9th Cir.1994).

The Ninth Circuit has recognized that a plaintiff may base a § 1983 claim on the government's infringement of a citizen's right to an unbiased tribunal. *Stivers v. Pierce,* 71 F.3d 732, 741 (9th Cir. 1995). In the Ninth Circuit, a court must first conclude that the plaintiff has a protected property interest before the court can engage in an analysis of whether the plaintiff's constitutional rights were violated because the decision-makers were not impartial. *See Lumbreras v. Roberts*, 319 F. Supp. 2d 1191, 1209-10 (D. Or. 2004).

As discussed in detail below, the court finds that Titus has a constitutionally protected interest in continued employment. Thus, the disputed issue is whether the core requirements of due process, notice and an opportunity to be heard, were violated because the City Council was so biased as to render the proceedings meaningless.

### a. Property Interest

Defendants contend that Titus was not entitled to procedural due process because he had no property interest in his continued employment. Plaintiff asserts that the Personnel Policy, adopted by the City Council, creates a property interest in continued employment.

The Fourteenth Amendment's due process guarantee applies to public employees who have a "property interest" in the terms or conditions of their employment. *E.g. Ulrich v. City and Cnty. of S.F.*, 308 F.3d 968, 975 (9th Cir. 2002) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 576 (1972)). That interest is established "by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* In Oregon, unless otherwise specified by

agreement or statute, employment is "at-will" and terminable by either party. *Rushing v. SAIF Corp.*, 223 Or. App. 665, 669, 196 P.3d 115, 117 (2008). "[A]t-will employees possess no protected property rights and therefore are not entitled to due process before being terminated." *Lawson v. Umatilla Cnty.*, 139 F.3d 690, 691-92 (9th Cir. 1998) (citation omitted). City Charters may secure property interests in an individual's employment. *Harrington v. City of Portland*, 677 F. Supp. 1491, 1500 (D. Or. 1987).

The relevant provision of the Charter for the City of Prairie City, Grant County, Oregon ("City Charter") states:

> Section 5. OTHER CITY OFFICERS AND EMPLOYEES. . . . The Council *may appoint* a City Attorney on either a temporary, special, periodic or permanent basis, a Chief of Police or City Marshal, a Fire Chief *and such other officers and employees* of the City as the Council deems necessary or advisable and *may remove any of them* at any time within their discretion.

Aff. of Robert E. Franz, Jr. in Supp. of Mot. for Summ. J. ("Franz Aff.") Ex. 119 at 3 (emphasis added).

It is well settled that a city "charter is, in effect, the city constitution. Any city ordinance, rule, or regulation in conflict with its provision is void." *Portland Police Ass'n v. Civil Service Board of Portland*, 292 Or. 433, 440, 639 P.2d 619, 623 (1982) (citations omitted).

> A city charter constitutes the organic law of a municipality. It must be first consulted to determine the rights, powers and privileges and the limitations of the authority of the city's legislative body. The municipality's action must find its support therein and *everything to the contrary* must give way to the mandate of that body of the city's organic law, unless the charter itself is in conflict with the constitution of the state. It cannot, by enacting a general ordinance . . .enlarge, restrict or repeal the express substantive provisions of its charter. This proposition is so elementary that no citations of authority are necessary to demonstrate the truth of its assertion.

*Harder  v. City of Springfield,* 192 Or. 676, 683, 236 P.2d 432, 435 (1951) (emphasis added).

21 - OPINION AND ORDER

Titus was employed as the Public Works Director.  The parties dispute whether this position is an "appointed officer" under the terms of the City Charter.  Defendants argue that as an "appointed officer," the clear language of the City Charter gives the City Council the power to terminate his employment at any time and for any reason.  Titus argues that he is an employee entitled to the due process protections provided by the Personnel Policy.  In the context of public employment, an employee must have a "legitimate claim of entitlement" to his job and must establish that he can only be terminated "for cause."  *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 780 (9th Cir. 1997).  The Personnel Policy here gives "regular" City employees a legitimate claim of entitlement in their continued employment.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-39 (1985) (holding employees possessed property rights in continued employment where statute stated civil service personnel could not be dismissed "except . . . for . . . misfeasance, malfeasance, or nonfeasance in office").

Here, the City Charter gives the City Council the discretion to appoint various City officers, including the enumerated positions of City Attorney, Chief of Police/City Marshal, and Fire Chief.  Franz Aff. Ex. 119 at 3.  The Charter does not require that the City Council appoint any of these officers, but merely gives it the authority to do so, and also gives it the authority to remove them at any time.  Defendants argue that the Charter in this case controls and cites case law to support their position.  However, the authority cited by defendants is distinguishable from the facts of this case.  In the cases cited by defendants, the charters provided "in no uncertain terms" that the employee serves at the pleasure of the City and therefore is an "at will" employee, removable at any time, for any purpose, and without any procedural due process protections.  *See Harrington*, 677 F. Supp. at 1499-1500 (finding that city charter provision stating that "the Mayor

22 - OPINION AND ORDER

shall appoint a Chief of Police . . . the Chief of Police shall be subject to removal by the Mayor"

provided that the Chief of Police serves at the pleasure of the Mayor and is removable at will);

*Haynes v. City of Sisters*, No. 97-6195-TC, slip op. at 7 (D. Or. Oct. 23, 1998) (holding the Chief

of Police was an at-will employee because the parties agreed that the Chief of Police was an

appointed officer and the city's charter stated that "officers shall be appointed and may be

removed by the mayor with consent of the council")[7]; *Meyers v. City of Gold Hill*, No. 94-3007-

CO, slip op. at 5 (D. Or. June 2, 1995) (finding that the City Recorder serves at the pleasure of the

City Council and is an at-will employee because the city charter stated that "[a]dditional officers

if the city shall be . . . a recorder . . . each of these officers shall be appointed and may be

removed by the council[.]")[8].

The language of the City Charter in this case does not expressly provide that the City

Council has the authority to appoint a Public Works Director nor terminate his employment at

will.  Therefore, the terms of the Personnel Policy do not necessarily conflict with the terms of the

City Charter.  Titus asserts that the Personnel Policy affords him a property interest in his job.

Specifically, Titus points to the following terms of the Personnel Policy in support of his

argument that he is entitled to procedural due process protections prior to termination of

employment:

/ / /

/ / /

---

[7]  Defendants have attached ac copy of this opinion as Exhibit 129 to Aff. of Hannah
Meisen-Vehrs in Supp. of Defs. Reply ("Meisen-Vehrs Aff.").

[8]  Defendants have attached a copy of this opinion as Exhibit 128 to the Meisen-Vehrs
Aff.

23 - OPINION AND ORDER

Section 1.3.  Definitions
\*\*\*
K. Dismissal.  Termination of employment with the City for reasons attributable to the employee.

Horrell Aff. Ex. 112 at 6.

Section. 3.2  Causes for Warning, Suspension, or Dismissal
\*\*\*
3.2.2  Cause for disciplinary actions: An action which reflects discredit upon the City's service, or is direct hindrance to the effective performance of City functions, shall be considered good cause for disciplinary action.

*Id.* at 26.

Section 3.3.  Form of Disciplinary Action
\*\*\*
3.3.2 . . . No regular employee shall be disciplined except for violations of established rules and regulations, and such discipline shall be in accordance with the procedures established by the personnel rules and regulations.

*Id.* at 28.

These sections  define the contours of the procedural processes owed to City employees. Indeed,  Horrell and the City Council justified termination of Titus with specific reference to the Personnel Policy.  The City Charter itself  provides in "Chapter VI: Powers and Duties of the City Officers,"  the  following positions and describes their duties in detail:  Mayor, Municipal Judge, City Recorder, City Attorney, Chief of Police or City Marshal, and Fire Chief.  Franz Aff. Ex. 119 at 5.  Notably absent from this list is the position of Public Works Director.  The drafters of the City Charter enumerated and provided detailed descriptions of several positions, including some that are not included in the discretionary language regarding "appointed officers," yet did not include a Public Works Director.  Therefore, viewing the record as a whole, I conclude that Titus had a property interest in his continued employment.  Accordingly, he was entitled to a hearing comporting with the minimal requirements of procedural due process.

### b. Fairness / Unconstitutional Bias

Titus does not argue that he was not provided notice, informed of the possible sanctions against him, or given the opportunity to be heard.  Rather, he takes issue with the fact that defendants failed to provide him with a meaningful opportunity to be heard by an impartial tribunal because the entire process leading up to his termination was unconstitutionally biased.

"It is well-settled that the Due Process Clause prevents the state from depriving a plaintiff of a protected property interest without a fair trial in a fair tribunal." *Stivers v. Pierce*, 71 F.3d at 741 (internal quotation and citation omitted).  Justice Black has stated:

> A fair trial in a fair tribunal is a basic requirement of due process.
> Fairness of course requires an absence of actual bias in the trial of cases.
> But our system of law has always endeavored to prevent even the
> probability of unfairness.  To this end no man can be a judge in his own
> case and no man is permitted to try cases where he has an interest in the
> outcome.

*In re Murchison,* 349 U.S. 133, 136 (1955); *see also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) ("[t]he Due Process Clause entitles a person to an impartial and disinterested tribunal[.]").

To make out a claim for unconstitutional bias, the plaintiff must "overcome a presumption of honesty and integrity" on the part of decisionmakers. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  He must show that the adjudicator "has prejudged, or reasonably appears to have prejudged, an issue." *Kenneally v. Lungren*, 967 F.2d 329, 333 (9th Cir. 1992), *cert. denied,* 506 U.S. 1054 (1993) (citation omitted).  A plaintiff may establish that he has been denied his constitutional right to a fair hearing before an impartial tribunal if  the proceedings and surrounding circumstances demonstrate actual bias on the part of the adjudicator. *See Stivers*, 71

F.3d at 741. (citing *Taylor v. Hayes*, 418 U.S. 488, 501-04 (1974)).[9] Here, Titus argues that the City Council punished him for failing to attend the executive session on March 26, 2008, that the City Council engaged in an unauthorized disclosure and discussion of his private medical information, that the City Council discussed the possibility of his abuse of alcohol, that the City Council discussed his prior work performance without any notice to him, that City Recorder Clingman had an actual bias against him, and that her involvement in his termination proceedings made it impossible for him to have a fair hearing in front of an impartial tribunal.

### i. Initial Termination Hearings

With regard to the termination hearings on March 26, 2008, and April 2, 2008, Titus argues that Clingman used her influence as the City Recorder to influence the City Council members, thereby ensuring that they had made up their minds, regardless of the outcome of the hearings.  In order to demonstrate Clingman's bias, he points to, among other things, a portion of Bass's deposition testimony where she stated that Clingman disliked Titus, and that Clingman had previously tried to get Titus fired over an issue relating to the wastewater lagoons.  The record shows that Clingman distributed a letter in 2006 to the City Council informing them that a septic dumping policy was being violated because an individual had been given unlimited access to the City's dump site.  Pl.'s Dep. Exs. Ex. 42.  However, the letter did not name Titus or allege any

---

[9] Additionally, the adjudicator's pecuniary or personal interest in the outcome of the proceedings may create an appearance of partiality that violates due process, even without any showing of actual bias.  *Id.* (citing *Gibson v. Berryhill*, 411 U.S. 564, 578-79 (1973)); *see also Withrow*, 421 U.S. at 47 (cases where the "probability of actual bias . . . is too high to be constitutionally tolerable" are those in which the "adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him.").  Titus does not argue that defendants had a pecuniary interest in the outcome of the proceedings.

involvement by Titus.  *Id.*    Titus was found not to have violated the policy because he was merely following the directions of the previous Mayor.  Pl.'s Dep. Exs. Ex. 42; Clingman Dep. at 29-30.  In a separate incident, Titus wrote a letter to the City Council on August 8, 2007, alleging that a citizen had told him that he had overheard Clingman and another individual talking about him in a derogatory manner and was plotting against him; he later retracted this letter.  Pl.'s Dep. Exs. Ex. 9; Clingman Aff. Ex. 121; Titus Dep. at 38-40.  Finally, Titus contends that Clingman influenced the City Council by preparing and distributing a summary of events prior to the March 26, 2008, hearing.  He argues that the summary of events had a "decidedly anti-Titus tone."  *See* Pl.'s Opp'n to Mot. for Summ. J. 8:13; Clingman Aff. Ex. 122.

Even assuming that Clingman disliked Titus, Titus' argument is not persuasive because Titus has failed to present any evidence showing that any of the City Council members were actually influenced by Clingman's personal opinions, and that those opinions had any bearing on the decision to terminate Titus.

What is more problematic than Clingman's alleged bias and influence is whether the City Council was so influenced by defendant McKinley's revelation that Titus suffers from bipolar disorder during the March 26, 2008, executive session so as to render all subsequent proceedings meaningless.  As discussed above, the fact that this information was revealed at all, and that it was not acknowledged until the court ordered defendants to produce the additional documentation, is  enough to raise a question of fact about the integrity of the process.  There are several questions that have yet to be resolved regarding whether the City or any members of the City Council harbored ill-will toward Titus or failed to act with honesty and integrity with regard to his termination proceedings.  Thus, summary judgment is not appropriate on Titus' procedural

due process claim regarding the intitial termination proceedings.  Defendants' motion for summary judgment on the First Claim against the City, is denied to the extent it is premised upon a violation of Titus' procedural due process rights.

### ii.  The Personnel Review Board Hearing

Titus alleges that the post-termination Personnel Review Board was biased.  In addition to two members of the Personnel Review Board (Bass and Harrington), Titus alleges City Recorder Clingman manipulated the members of the Personnel Review Board, rendering the review process unconstitutionally biased.  A court must independently assess the adequacy of the post-termination proceedings because the inadequacy of a post-termination process may itself be the source of a distinct due process violation.  *Clements*, 69 F.3d at 332.

Here, the Personnel Policy required that the Personnel Review Board be "comprised of one Councilor, one person at large and one peer of the employee(s) appointed by the Mayor for the particular grievance."  Horrell Aff. Ex. 112 at 31.  Even though the Personnel Review Board was comprised of three individuals who satisfied these criteria, Titus alleges that Clingman drove the selection of the individuals who comprised the Personnel Review Board and therefore, Titus did not receive a fair review of the City Council's decision to terminate him.  The court will review the allegations relating to each member of the Personnel Review Board.

Harrington was selected to serve as the City Council representative on the Personnel Review Board. Titus alleges that because Harrington was the one who made the motion to terminate him at the April 2, 2008, hearing, his presence on the Personnel Review Board rendered the proceedings constitutionally deficient.  However, a board member who makes an initial decision and subsequently serves on a review board to review that decision does not, without

more, create bias.  *See Vanelli v. Reynolds Sch. Dist. No. 7*, 667 F.2d 773, 779 n.10 (9th Cir. 1982) (concluding that a school board member's prior participation in a termination decision did not render him impermissibly biased at a subsequent hearing).

Here, Titus alleges no additional facts evidencing Harrington's bias other than his participation in the City Council meetings, and that Harrington made the initial motion to terminate Titus.  However, this fact alone did not necessarily demonstrate that he was so biased that his participation on the Personnel Review Board rendered those proceedings constitutionally deficient.  *Id.*

Bass was selected to fill the "person at large" position on the Personnel Review Board. Titus argues that Clingman drove the process by meeting with Horrell and having him appoint Bass to this position.  He also argues that Bass is biased because she is Clingman's friend and because their children are acquaintances.  Titus further asserts that Bass was biased because she had participated in a disciplinary proceeding in which Titus was involved while serving as a City Council member in 2002 to 2004.  Although Titus fails to specify the disciplinary matter to which he is referring, the record shows that on July 23, 2003, several individuals brought a complaint against Titus.  Pl.'s Dep. Exs. Ex. 41 at 5.  While the record does not detail the nature of the complaint, it does reflect that in accordance with the Personnel Policy, the four City Council members present at the hearing, including Bass, unanimously voted to reprimand Titus and have him attend supervisory training.  *Id.*  There are no other facts relating to Bass' involvement. Finally, Titus contends that Bass was biased because she was directly involved in the investigation leading to his dismissal because Clingman contacted her in order to confirm whether Titus was indeed working on the sidewalk project in John Day.  Courts have clearly stated that

the same party may investigate and adjudicate a dispute without violating due process, provided that there is no evidence of actual bias by the decisionmaker. *See, e.g., Withrow*, 421 U.S. at 47 (concluding that the combination of investigative and adjudicative functions does not, without more, constitute a due process violation).

Titus presents no facts indicating that Bass herself actually harbored any personal animosity against him, failed to act independently as a member of the Personnel Review Board, or had prejudged his case before the hearings. Therefore, there is no evidence that Bass was so biased against Titus so as to deny him an impartial tribunal.

Finally, Percy served on the Personnel Review Board in his position as Titus' peer, since he was the Public Works Director for nearby Canyon City. While Percy is not named as a defendant, Titus asserts that he was chosen to serve on the Personnel Review Board because he would take whatever position Bass and Harrington took, and they were already biased against him, as discussed above. He points to a portion of Horrell's testimony where he stated that he thought Percy did not "care really which way it went." Horrell Dep. at 63. When read in context, however, Horrell testified, "I think Les Percy was impartial. I don't think Les had a care really which way it went. I think he was fair." *Id.* In light of the above, Horrell's testimony indicates that he believed Percy was an impartial decisionmaker. Titus has presented no evidence to the contrary, other than unsupported allegations that he believed Percy was biased. This is not enough to overcome the presumption that Percy acted with honesty and integrity in his position on the Personnel Review Board.

The initial decision by the City Council to terminate Titus, however, was tainted by the irregularities outlined above. Harrington's participation in that decision is enough to raise a

question of his bias as a member of the City Council and as a participant on the Personnel Review Board.  While Titus has failed to demonstrate that the other two member of the Personnel Review Board were necessarily biased against Titus, there is sufficient evidence of Harrington's involvement in the initial  termination decision, combined with the remaining questions about bias in those proceedings, to raise a question about the fairness of the review by the Personnel Review Board.

There are sufficient fact questions regarding the Personnel Board proceedings resulting in the termination of Titus to preclude summary judgment regarding his First Claim based on violations of procedural due process.  Summary judgment on this claim is denied.

### 3.  Substantive Due Process

Titus alleges that the City violated his substantive due process rights.  Titus argues that he was not afforded substantive due process because he had a protected right to his position as the City's Public Works Director, and that as a result of defendants' actions, he has been denied access to his profession.  He asserts that the management of roads, water systems, sewer systems, parks, and landfills is specific to a city government, and despite his best efforts, he has been unable to secure other employment in his field.

The substantive component of the Due Process Clause "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'"  *Nunez v. City of Los Angeles,* 147 F.3d 867, 871 (9th Cir.1998) (quoting *United States v. Salerno,* 481 U.S. 739, 746 (1987) (additional citation omitted).  "To establish a violation of substantive due process, the plaintiffs must prove that the government's action was 'clearly arbitrary and unreasonable, having no

substantial relation to the public health, safety, morals, or general welfare.'" *Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 882 F.2d 1398, 1407 (9th Cir. 1989), *cert. denied*, 494 U.S. 1016 (1990), *overruled on other grounds*, *Armendariz v. Penman*, 75 F.3d 1311 (9th Cir. 1996) (*en banc*) (quoting *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395 (1926)).

"A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of Cal., Inc.,* 24 F.3d at 62. The Supreme Court has not specified the boundaries of the right to pursue a profession, but has identified it generally. *See Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999). The majority of courts have declined to extend substantive due process protections to a particular public employment position. *See Dunn v. Reynolds Sch. Dist.*, Civil No. 09-1259-HU, 2010 WL 4718781, at * 11 (D. Or. November 15, 2010)(citations omitted). While the Ninth Circuit has recognized that a plaintiff may make out a substantive due process claim if he is unable to pursue an occupation based on government actions that were arbitrary and lacking a rational basis, almost all of the cases on this subject deal with government legislation or regulation, and not the acts of the government as an employer. *Engquist v. Oregon Dept. of Agric.,* 478 F.3d 985, 996-97 (9th Cir. 2007). Consequently, the Ninth Circuit has limited substantive due process claims in the employment arena to "extreme cases such as a 'government blacklist' . . .which effectively excludes the blacklisted individual from his occupation, much as if the government had yanked the license of the individual in an occupation that requires licensure." *Engquist*, 478 F.3d at 997-98 (citation and quotation omitted). "It is not enough that the employer's stigmatizing conduct has some adverse effect on the employee's job prospects; instead, the employee must show that

the stigmatizing actions make it virtually impossible for the employee to find new employment in his chosen field."  *Id.* (internal quotation marks and citation omitted).

In *Enquist*, the Ninth Circuit held that as a matter of law, the state's defamatory statements to two or three other people in the industry and the mere fact that plaintiff "was having much difficulty finding a job in the same field in Oregon" were insufficient to demonstrate the state's actions caused plaintiff's job-search difficulties.  *Id.* at 999.  The court concluded that it appeared the plaintiff worked in a "highly specialized field, and there simply [were] not many jobs available in that field in Oregon."  *Id.*

Titus has failed to demonstrate that the City's actions foreclosed his ability to pursue his profession, and not merely a particular job.  Furthermore, he presents no evidence showing that his inability to find employment is anything more than the expected consequence of seeking employment in a depressed economy characterized by high unemployment, as is the case here in the State of Oregon.[10]  In light of the above, Titus has failed to present sufficient evidence showing that the City has made it virtually impossible for him to find new employment, or that it essentially blacklisted him from his profession.  Accordingly, there was no violation of plaintiff's substantive due process rights.  The City is granted summary judgment on the First Claim to the extent that is alleges a violation of Titus' substantive due process rights.

**B.  § 1983 Claims against Individual Defendants**

Titus' Second and Third Claims also allege violation of his substantive due process rights by the individual City Council members and City Recorder Clingman for their roles in

---

[10]  The State of Oregon's seasonally adjusted unemployment rate as of July 2010 was 10.6%.  *Local Area Unemployment Statics*, U.S. DEP'T OF LABOR (July 18, 2010), http://www.bls.gov/lau/home.htm.

terminating him initially (Second Claim), and by against Bass, Harrington, and City Recorder Clingman (Third Claim) for their involvement with the Personnel Review Board proceedings. The factual allegations are the same as those against the City discussed above. Consequently, all defendants are entitled to summary judgment on the First, Second, and Third claims to the extent that they rest on an alleged violation of Titus' substantive due process rights.

In Titus' Second Claim he alleges § 1983 claims for violations of his right to privacy and for violations of procedural and substantive due process against the individual City Council members and City Recorder Clingman. His Third Claim alleges § 1983 claims for violations of his procedural and substantive due process rights against Bass, Harrington, and City Recorder Clingman. The individual defendants move for summary judgment against these claims, asserting that the individual defendants committed no constitutional violations and that even if they did, they are entitled to qualified immunity. As discussed above, Titus' claims for violations of his substantive due process rights fail, leaving only § 1983 claims for violations of privacy and procedural due process against the individual defendants.

### 1. **Individual liability for constitutional violations**.

The individual City Council members' decision to terminate Titus, may have resulted in the City's liability for violations of Titus' constitutional right to privacy and procedural due process. Whether these individual are entitled to qualified immunity is discuss below.

City Recorder Clingman has also been named individually for her alleged role in Titus' termination. City Recorder Clingman, however, while alleged to have influenced the City Council members, did not take part in the decision to terminate Titus either at the initial meetings

or at the Personnel Review Board hearing. Therefore, she is not responsible for the decision by the City to terminate Titus, nor is she responsible for the decision of the Personnel Review Board. She was neither a voting member of the City Council nor the person authorized to select the Personnel Review Board. Therefore, summary judgment in favor of City Recorder Clingman is granted on Titus' Second and Third Claims.

Defendant Bass has also been named in her individual capacity for her role as a member of the Personnel Review Board. As discussed above, Titus has presented insufficient evidence to demonstrate that Bass was either unfairly influenced by City Recorder Clingman or anyone else in her role on the Personnel Review Board. Summary judgment in favor of Bass is granted as to Titus' Third Claim.

### 2. Qualified Immunity

The members of the City Council contend that they are entitled to qualified immunity as individuals for any alleged violations of Titus' § 1983 rights. Qualified immunity is only available to defendants in their individual capacities. *See Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985); *Brandon v. Holt*, 469 U.S. 464, 472-73 (1985); *Owen v. City of Independence*, 445 U.S. 622, 651 (1980). To the extent that Titus may make allegations against the individual defendants in their official capacities (Compl. at ¶ 7), "official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell*, 436 U.S. at 690 n. 55.

The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Therefore, public officials are generally immune from civil liability unless their actions violate clearly established law because "a reasonably competent public official should know the law governing his conduct." *Id*. "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citation and internal quotations omitted).

In order to determine whether the doctrine of qualified immunity applies to individual defendants, the court must decide whether the plaintiff has shown that a constitutional or statutory right has been violated and whether the right at issue was "clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court recently held that lower courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

The inquiry "must be undertaken in the light of the specific context of the case, not as a broad general proposition." *Saucier* , 533 U.S. at 201. Officials may only be held liable for violation of a right the "contours [of which are] sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Id.* at 202. Therefore, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id*. To be clearly established, the law need not be a "precise formulation of the standard" where

"various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Id*. The key inquiry in determining whether an officer has qualified immunity is whether the he or she has "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002).

### a.  Right to Privacy

Titus alleges two claims for a violation of his constitutional right to privacy based on the defendants' handling of his private medical information.  The First Claim is against the City as discussed above, and the Second Claim is against the individual City Council members and City Recorder Clingman.  While only the individual defendants are eligible for qualified immunity, the underlying factual allegations are the same.

As previously discussed, the Ninth Circuit recognizes an individual's interest in avoiding disclosure of personal matters, including medical information. *In re Crawford*, 194 F.3d at 958;. *Tucson Woman's Clinic v. Eden*, 379 F.3d  at 551.  Also, as previously discussed, there must be a balancing of interests between a person's privacy rights and proper government interest.  *Roe v. Sherry*, 91 F.3d at 1274;  *see also Thorne v. City of El Segundo*, 726 F.2d at 469.

For purposes of qualified immunity analysis, the issue is whether the disclosure at issue is rises to the level of a constitutional violation which has been clearly established.  The Ninth Circuit has not directly addressed the issue of medical privacy in the context of an employer's request for an employee's medical information as related to the employee's use of sick leave.  The Ninth Circuit has noted that "if the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered 'clearly

established' at least in the absence of closely corresponding factual and legal precedent." *Baker v. Racansky,* 887 F.2d 183, 187 (9th Cir. 1989) (quoting *Myers v. Morris,* 810 F.2d 1437, 1462 (8th Cir.), *cert. denied,* 484 U.S. 828 (1987)).  In order to conclude that Titus' constitutional right to privacy was violated, the City's interest in gathering information to determine whether Titus violated the sick leave policy must be weighed against Titus' right to privacy in the unauthorized disclosure of his medical information.  This balancing "makes the qualified immunity defense difficult to overcome, especially in light of the requirement that the substantive constitutional right be clearly established at the time of the alleged violation." *Devereaux v. Perez*, 218 F.3d 1045, 1055 (9th Cir. 2000).

The case law on the issue of privacy interests related to the disclosure of personal information is "murky at best."  *O'Phelan v. Loy,* CV-09-00236 SOM/KSC, 2011 WL 719053, at * 11 (D. Haw. Feb. 18, 2011); *See also Arakawa v. Sakata*, 133 F.Supp.2d 1223, 1226-29 (D. Haw. 2001) (discussing cases).  The court cannot necessarily conclude that the constitutional right to privacy completely bars an employer from discussing medical information related to an employee's use of sick leave because the parameters surrounding an employee's right to privacy in this context have not been clearly defined.  Therefore, a reasonable official in the individual defendants' circumstances could have believed that their conduct was lawful.  These defendants exercised poor judgment regarding the circumstances in which Titus' private medical  information was revealed.  Despite this, the court cannot conclude that any of the individual defendants knowingly violated a clearly established constitutional right.  Consequently, the individual

members of the City Council are entitled summary judgment based on qualified immunity on

Titus' Second Claim to the extent that it is premised upon a violation of Titus' right to privacy.

### b. Procedural Due Process

The constitutional right to a hearing in front of an unbiased tribunal is a basic requirement

of due process and is a clearly established right. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) ("a

biased decisionmaker [is] constitutionally unacceptable.")

Thus, the individual City Council defendants are entitled to qualified immunity on this

issue only if they acted with honesty and integrity and without bias during Titus' termination

proceedings, and in the case of Harrington, during the review by the Personnel Review Board.

*Id.*; *Stivers*, 71 F.3d at 741.  As discussed, these factual issues must be resolved by the jury before

a constitutional due process violation can be established.  Accordingly, the individual defendants'

motion for summary judgment based on the qualified immunity defense regarding Titus'

procedural due process claim in his Second Claim and, as to Harrington, in his Third Claim is

denied.

## II. Remaining State Law Claims (Fifth, Seventh, Eighth, and Ninth Claims)

Titus also brings claims against the City arising under Oregon law.  Titus has abandoned

his age discrimination claim (Sixth Claim).  The remaining state law claims are for violations of

OFLA (Fifth Claim), Wrongful Discharge (Seventh Claim), Invasion of Privacy (Eighth Claim),

and IIED (Ninth Claim).

/ / /

/ / /

39 - OPINION AND ORDER

**A.  OFLA (Fifth Claim)**

Titus alleges that the City violated his OFLA rights in several ways, including by infringing on his right to privacy in his medical information, denying him leave to which he was entitled, retaliating against him because he invoked his right to family leave, and by otherwise interfering with the exercise of his rights under the statute.  Compl. ¶¶ 51-56.  The City moves for summary judgment in its favor because OFLA only applies to employers with more than 25 employees, and it asserts that during the year when Titus took leave, the City did not meet this requirement.

OFLA requires employers with 25 or more workers to provide eligible employees twelve weeks of unpaid leave a year in the event that a "serious health condition of the employee . . . renders the employee unable to perform at least one of the essential functions of the employee's regular position."  *See* O.R.S. 659A.153 - O.R.S. 659A.162.  OFLA only applies "to employers who employ 25 or more persons in the State of Oregon for each working day during each of 20 or more calendar workweeks in the year in which the leave is to be taken or in the year immediately preceding the year in which the leave is to be taken."  O.R.S. 659A.153(1).

The City has presented payroll data in support of its position that during the relevant time frame, the City did not employ the requisite number of employees for at least 20 calendar workweeks as required by the statute.  Clingman Aff. at 2, Exs. 117, 118.  In 2008, the year that Titus took his sick leave, the City employed eight people (Ex. 117); in the previous year, the City employed six people (Ex. 118).  Titus seeks to include the members of the City's Fire Department on the basis that the Fire Department Chief attends the City Council meetings, and because the

members of the Fire Department are compensated from the City's general fund, are covered under

the City's worker's compensation policy, and receive City-paid life insurance.  It is clear that the

members of the Fire Department are covered under the City's worker's compensation program and

some form of life insurance; it is also clear that they serve on a volunteer basis yet receive some

form of minimal compensation.  Clingman Dep. at 13, 22; Horrell Dep. at 51.  City Recorder

Clingman testified that they are paid a "volunteer reimbursement [of] about $4.00 based on if they

were . . . attending a meeting or on a fire."  Clingman Dep. at 13.  City Council members Coe and

McKinley testified that they are paid a "small hourly figure," or a "per fire a slight stipend."  Coe

Dep. at 41, 44; McKinley Dep. at 46, 54-55.  The court concludes that because they are

compensated, albeit nominally, the volunteer members of Fire Department are "workers" for

purposes of OFLA.  The next question is how many of these volunteer members can be counted

for OFLA purposes, because by all accounts, their numbers fluctuated.  *See* Coe Dep. at 45;

McKinley Dep. at 47-48.

Titus contends that there are 20-49 members of the Fire Department that should be

included as City employees for OFLA purposes, on the basis of information contained in a

printout provided by the Oregon Labor Market Information System ("OLMIS").  Farra Aff. (#60)

Ex. C at 1.  However, the printout does not specify for what dates the information is valid, so it is

difficult to get an accurate count of the number of fire department employees the City employed

during the relevant years.  The Fire Department's attendance rosters for those years is more

helpful.  Meisen-Vehrs Aff. Ex. 130-131.  It is clear that for 2008 (from January through

December), there were only four members of the Fire Department (Ed Negus, Dean Hicks, Eddy

Hicks, and Adrian Wheeler) that attended at least 20 meetings, as required by O.R.S. 659A.153(1).  Meisen-Vehrs Aff. Ex. 130 at 1.  The data for 2007 is less clear, as there are only 18 meetings recorded.  Meisen-Vehrs Aff. Ex. 131 at 1.  While there may have only been 18 meetings held that year (the date range for 2007 is only from April through December), there are no other figures which indicate any other meetings.  Since the statute requires that an employee work at least 20 calendar workweeks, the 2007 roster does not establish that there were any members of the Fire Department that worked the requisite number of weeks in order to be counted for OFLA purposes.

Based on the relevant information currently in the record, it appears as though during 2008, there were eight City employees and four members of the Fire Department that attended the requisite number of meetings, for a total of 12 employees.  During 2007, there were six City employees and no members of the Fire Department that attended the required number of meetings, for a total of six employees.  Even including members of the all-volunteer Fire Department that qualify under O.R.S. 659A.153(1), the City does not employ at least 25 people, so Titus does not have a job-related right to medical leave under OFLA.  Therefore, the City is granted summary judgment on the Fifth Claim.

**B.  Wrongful Discharge (Seventh Claim)**

Titus' Seventh Claim alleges that the City wrongfully discharged him for pursuing his right to privacy and for exercising his right to medical leave.  Compl. ¶¶ 60-63.  The City moves for summary judgment on this claim in part because the claim is precluded by the adequate remedies provided by § 1983.

Under Oregon law, the tort of wrongful discharge is a narrow exception to the general rule that an employer may discharge an employee at any time for any reason unless doing so violates a contractual, statutory, or constitutional requirement. *Babick v. Oregon Arena Corp.*, 333 Or. 401, 407, 40 P.2d 1059, 1062 (2002) (citation omitted). Oregon recognizes two general types of wrongful discharge: "(1) when the discharge is for exercising a job-related right that reflects an important public policy; or (2) when the discharge is for fulfilling some important public duty." *Id.* With respect to the first category, a "job-related right is a personal benefit or right to which the employee is entitled as a matter of public policy." *Brown v. Bd. of Educ.,* 207 Or.App. 163, 169, 139 P.3d 1048, 1052, *rev. denied,* 342 Or. 253, 149 P.3d 1212 (2006). Titus claims that his termination falls under the first exception.

However, the tort of wrongful discharge was not "intended to be a tort of general application, but rather an interstitial tort to provide a remedy when the conduct in question is unacceptable and no other remedy [is] available." *Cantley v. DSMF, Inc.,* 422 F. Supp. 2d 1214, 1220 (D. Or. 2006) (citing *Draper v. Astoria Sch. Dist.,* 995 F. Supp. 1122, 1128 (D. Or. 1998)) (internal quotation omitted); *see also Walsh v. Consol. Freightways, Inc.,* 278 Or. 347, 351–52, 563 P.2d 1205, 1208–09 (1977). A wrongful discharge claim is precluded if an existing remedy adequately protects the public interest in question. *Draper,* 995 F.Supp at 1130-31. Generally, this court recognizes that § 1983 provides adequate statutory remedies and precludes a claim for wrongful discharge when based upon the same allegations. *See, e.g., Draper,* 995 F.Supp. 1122; *Shultz v. Multnomah Cnty,* Civil No. 08-886-BR, 2009 WL 1476689 (D.Or. May 27, 2009);

*Baynton v. Wyatt,* 411 F.Supp. 2d 1223 (D.Or. 2006); *Minter v. Multnomah Cnty*, Civil No. 01-352-ST, 2002 WL 31496404 (D.Or. May 10, 2002).

Titus' wrongful discharge claim is premised upon the same allegations as those underlying his § 1983 claims, namely his right to privacy in refusing to disclose confidential medical information.  *See* Compl. ¶¶ 61-62.  Titus' wrongful discharge claim is also premised upon his exercise of his right to medical leave, as well as his resistance to the City's alleged discrimination and retaliation against him on the basis of his age, taking medical leave, and for exercising his right to privacy. *Id.*  Titus has abandoned his age discrimination claim, his FMLA claim, and his § 1983 claim to the extent that it was premised upon violations of age discrimination and FMLA.  Additionally, as discussed above, he does not have a job-related right to medical leave under OFLA.  Essentially, the only remaining allegations that form the basis of Titus' wrongful discharge claim are those relating to his right to privacy.  Since Titus still has a remedy for the City's violation of his privacy under § 1983, and because Titus has presented no evidence that his remedy under § 1983 would be different than that available under a wrongful discharge claim, the City is granted summary judgment on Titus' Seventh Claim for wrongful discharge.

### C.  Invasion of Privacy (Eighth Claim)

Titus' Eighth Claim alleges that the City violated his right to privacy when it denied him the opportunity to discuss his medical condition in private, not in front of the City Council and City Recorder Clingman, who were allegedly biased against him.  Compl. ¶¶ 64-66.  The City asserts that it is entitled to summary judgment because there is no evidence that it intentionally intruded on Titus' privacy.

Oregon recognizes four theories that comprise the tort referred to as invasion of privacy: "(1) intrusion upon seclusion; (2) appropriation of another's name or likeness; (3) false light, and (4) publication of private facts." *Mauri v. Smith*, 324 Or. 476, 482, 929 F.2d 307, 310 (1996). While Titus does not explicitly state under which theory he brings his invasion of privacy claim, it appears as though he is asserting a theory of intrusion upon seclusion. To prevail on an invasion of privacy claim under a theory of intrusion upon seclusion, a plaintiff must show: "(1) an intentional intrusion, physical or otherwise, (2) upon plaintiff's solitude or seclusion or private affairs or concerns, (3) which would be highly offensive to a reasonable person." *Id.* 324 Or. at 483, 929 F.2d at 310; *see also McLain v. Boise Cascade Corp.,* 271 Or. 549, 533 P.2d 343 (1975).

The City does not appear to dispute that Titus has a privacy interest in keeping his confidential medical information private; rather, the City alleges that it did not intrude, and that if it did, it had a legitimate interest in inquiring about the underlying reasons for Titus' sick leave. However, the unauthorized disclosure of his confidential medical information at the March 26, 2008, executive session creates serious concerns about whether the City inappropriately intruded upon Titus' privacy.

Titus' common law claim for invasion of privacy is premised upon the same facts and allegations as his federal privacy claim. For the reasons discussed above, material issues of fact exist regarding whether the City intentionally intruded upon Titus' privacy when McKinley disclosed his personal medical information to the City Council during executive session on March 26, 2008. Therefore, the City is denied summary judgment on Titus' Eighth Claim for invasion of privacy.

**D.  IIED (Ninth Claim)**

In his Ninth Claim, Titus alleges that the City's intentional conduct, through its officials, constituted extraordinary transgressions outside the bounds of socially tolerable behavior, given that at the time of his termination, he was an employee of the City for over 20 years, and was suffering from a serious medical condition.  Compl. ¶¶ 67-70.  The City moves for summary judgment because it argues the City's termination of Titus is not socially intolerable conduct.

Under Oregon law, to prevail on a claim for IIED a plaintiff must prove that "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct."  *McGanty v. Staudenraus,* 321 Or. 532, 543, 901 P.2d 841, 849 (1995) (citation omitted).

Oregon courts have held that the "trial court plays a gatekeeper role in evaluating the viability of an IIED claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability." *House v. Hicks,* 218 Or. App. 348, 358, 179 P.3d 730, 736, *rev. denied*, 345 Or. 381, 195 P.3d 911 (2008) (citation omitted).  "Whether conduct is an extraordinary transgression is a fact-specific inquiry, to be considered on a case-by-case basis, based on the totality of the circumstances.  [The court considers] whether the offensiveness of the conduct exceeds any reasonable limit of social toleration, which is a judgment of social standards rather than of specific occurrences."  *Id.*, at 358-59, 179 P.3d at 736 (internal citation and quotation omitted).

While several contextual factors guide the court's analysis, the most important is whether the parties are in a special relationship, such as that between an employer-employee. *McGanty*, 321 Or. At 547-48, 901 P.2d at 851-52. The relationship may be one that "imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers." *Id*.

Here, Titus and the City, as employee-employer, had a special relationship that potentially heightened the outrageousness of the conduct. However, the specific conduct that Titus complains of is insufficient to establish his *prima facie* case for IIED. Even considering McKinley's inappropriate and unauthorized disclosure of Titus' confidential medical information, the City's conduct, by way of its officials, does not go beyond the reaches of socially tolerable behavior. The fact that this information was disseminated to the City Council without Titus' consent, standing alone, is not an extraordinary transgression outside the bounds of socially tolerable conduct. Accordingly, the City should be granted summary judgment on Titus' Ninth Claim for IIED.

## ORDER

For the reasons discussed above, Defendant's motion for summary judgment (docket #32) should be GRANTED as to:

> 1. The portions of the First, Second, and Third Claims to the extent that they allege § 1983 claims based on use of protected medical leave, age discrimination, and substantive due process;
>
> 2. The Fourth Claim based on FMLA;

3.  The state law claims as alleged in the Fifth, Sixth, Seventh, and Ninth
Claims;

4.  The individual defendants on the Second Claim based on § 1983
violations of the right to privacy;

5.   The Second and Third Claims against defendant Clingman;

6.  The Third Claim against defendant Bass;

and DENIED as to:

1.  The First Claim against the City based on § 1983 violations of the right
to privacy and procedural due process;

 2.  The Second Claim against defendants Horrell, Munyon, Primozic,
Woodworth, Coe, McKinley, and Harrington, based on § 1983 violations of
procedural due process;

3.  The Third Claim against defendant Harrington based on § 1983
violation of procedural due process;

4.  The Eighth Claim based on the state law claim for invasion of privacy.


DATED this 14th day of July, 2011.

/s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge


48 - OPINION AND ORDER